UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN TROUT,

     Plaintiff,

                                 Case No. 1:25-cv-1378

v.

                                 Hon. Hala Y. Jarbou

MEIJER, INC.,

     Defendant.

_____/

## OPINION

The Public Health Service Act (PHSA) prohibits employers who operate health care plans for their employees from discriminating against participants based on their health conditions. An exception exists for "wellness programs" that incentivize healthy choices, though such programs must meet strict statutory requirements. Defendant Meijer, Inc., administers a health care plan containing a wellness program that rewards people for refraining from tobacco use. In this putative class action brought under the Employee Retirement Income Security Act (ERISA), Plaintiff Justin Trout argues that Meijer's plan violates several of the PHSA's requirements. Meijer now moves to dismiss for failure to state a claim (ECF No. 11).

The Court will grant the motion to dismiss in part and deny it in part. Specifically, the Court finds that (1) Trout has not stated a claim that Meijer violated the requirement that it provide the "full reward" to all similarly situated employees; (2) Trout has stated a claim that Meijer violated the requirement that it make certain disclosures in plan documents; (3) Trout has not stated a claim that Meijer breached its fiduciary duties or engaged in prohibited transactions, nor has he established standing to bring such claims; (4) claims that accrued before November 5, 2021, are

barred by the statute of limitations; and (5) Trout may seek remedies of equitable restitution and disgorgement, but not seek surcharge.

## I. BACKGROUND

### A. Statutory Framework

Employer health care plans must comply with ERISA, 29 U.S.C. §§ 1001–1461.  Under a PHSA provision incorporated by ERISA, a health insurance plan generally "may not require any individual . . . to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor."  42 U.S.C. § 300gg-4(b)(1); 29 U.S.C. § 1185d (incorporating § 300gg-4).  However, a plan may charge different premiums based on employees' participation in "programs of health promotion and disease prevention."  42 U.S.C. § 300gg-4(b)(2)(B).  If such a program "is based on an individual satisfying a standard that is related to a health status factor," the program must comply with certain specified requirements.  *Id.* § 300gg-4(j)(3).  Relevant here, the plan must "give individuals eligible for the program the opportunity to qualify for the reward under the program at least once each year."  *Id.* § 300gg-4(j)(3)(C).  Furthermore, "[t]he full reward under the wellness program shall be made available to all similarly situated individuals."  *Id.* § 300gg-4(j)(3)(D).  This means, among other things, that the program must allow for a "reasonable alternative standard" that accommodates people with medical conditions that make it "inadvisable" or "unreasonably difficult" to complete the wellness program.  *Id.* § 300gg-4(j)(3)(D)(i)(I), (II).  Finally, every plan document that "describe[s] the terms of the wellness program" must also disclose "the availability of a reasonable alternative standard," although such a disclosure is unnecessary if a plan document only "disclose[s] that such a program is available, without describing its terms."  *Id.* § 300gg-4(j)(3)(E).

**B. Relevant Facts**

Meijer is a grocery store chain that operates throughout the Midwest; Trout is a Meijer employee living in Illinois.  (Compl. ¶¶ 14, 16, ECF No. 1.)  Meijer offers a health insurance plan to its employees that is subject to ERISA.  (*Id.* ¶ 17.)  This plan includes a wellness program in the form of a tobacco surcharge.  Insured employees who use tobacco products must pay an extra $20 per week in premiums.  (*Id.* ¶ 14.)  If an employee signs a pledge at the start of the year stating that they do not and will not use tobacco products, they are rewarded by not having to pay the $20 surcharge.  (*See id.* ¶ 33.)  Trout has not certified that he is tobacco-free, so he has been required to pay the surcharge.  (*Id.* ¶ 14)  Meijer collects the surcharges directly from its employees' paychecks along with their normal health care premiums. (*See id.* ¶ 34.)  The surcharges are used to offset Meijer's own contributions to the plan; in other words, Meijer has promised to contribute a certain amount to the plan, but pays a portion of that contribution with the surcharges.  (*Id.* ¶ 42.)

For employees who do use tobacco, Meijer offers an alternative standard in the form of a "tobacco cessation program."  (*Id.* ¶ 33.)  If an employee registers for the cessation program during the open enrollment period—that is, the first two months of coverage—and completes it within the first six months of coverage, their entire year of tobacco surcharges is eliminated, including surcharges they paid in prior months.  If an employee completes the plan in the second half of the year, their premiums will only be reduced prospectively.  (*Id.*)  Moreover, if an employee does not make an election during the open enrollment program and defaults into a plan, they are automatically assumed to be a tobacco user and may only prospectively (not retrospectively) avoid the surcharge.  (*Id.* ¶ 36.)  Meijer provides a benefits guide to its employees that contains the following information:

**Tobacco Surcharge:** $1,040 - $2,080 per year for tobacco users

If you (and your spouse/domestic partner) enroll in a Meijer medical plan and use tobacco, the $20 per week surcharge will apply per tobacco user. If you are not a tobacco user, recertification is required every year on the Meijer Rewards site. Meijer also offers a tobacco cessation program – at no cost to enrolled team members (and their spouse/domestic partner). If you complete the program requirements by the deadlines, your tobacco surcharge may be refunded.

(*Id.* ¶ 34.)

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim if it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.* at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

4

### III. ANALYSIS

Meijer argues that Trout fails to state a claim, some of Trout's putative class claims are barred by the statute of limitations, and some of the relief Trout requests is unavailable under ERISA.  As detailed below, the Court finds that Trout has stated a claim for violation of 42 U.S.C. § 300gg-4(j)(3)(E), some class claims are time-barred, and Trout may seek disgorgement and equitable restitution but not surcharge.

#### A. Failure to State a Claim

Trout brings claims under section 502(a)(2) and (a)(3) of ERISA.  Subsection (a)(2) allows a plaintiff to recover for a defendant's breach of fiduciary duty, while subsection (a)(3) allows recovery for "any act or practice which violates any provision of" ERISA.  29 U.S.C. § 1132(a)(2), (a)(3).  Trout argues that Meijer has violated 42 U.S.C. § 300-gg(4)(j)(3)(D) by not providing the "full reward" to employees who complete the wellness program in the second half of the year (Count I), violated § 300gg-4(j)(3)(E) by not disclosing that physician recommendations will be accommodated (Count II), and breached its fiduciary duties and engaged in prohibited transactions by collecting unlawful surcharges and using them to offset its own contributions (Counts III and IV).  As discussed below, the Court finds that Trout has stated a claim for violation of § 300gg-4(j)(3)(E) but not for violation of § 300-gg-4(j)(3)(D), breach of fiduciary duty, or engaging in prohibited transactions.

#### 1. "Full Reward" Requirement

Trout first argues that Meijer's plan violates the statutory requirement that "[t]he full reward under the wellness program shall be made available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(3)(D).  Trout also cites the preamble to a Department of Labor (DOL) final rule implementing § 300gg-4, which describes the "full reward" requirement in the following way: "[I]f a calendar year plan offers a health-contingent wellness program with a premium discount

and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual." Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 33163 (June 3, 2013).[1] Trout argues that if a plan allows employees to complete the reasonable alternative standard at different times of the year, the employees must always receive full retrospective refunds of their surcharges regardless of when they complete the standard. Meijer allows employees to complete the alternative standard (the tobacco cessation program) at any time of year, but provides only *prospective* surcharge reductions (i.e., reductions for future months) to an employee who completes the standard more than six months after the open enrollment period. Trout argues that this prospective-only surcharge reduction violates § 300gg-4(j)(3)(D).

The Court disagrees. Section 300gg-4 requires that employers allow employees to qualify for the reward at least once a year, and give employees the full reward. Meijer provides numerous opportunities to obtain the full reward, as long as the employee qualifies in the first sixth months. Trout's complaint is that Meijer has also provided additional opportunities for employees to qualify for a partial reward. His view entails that Meijer could bring its plan into compliance with § 300gg-4 by offering *no* reward to employees who qualify in the second half of the year. In other words, Trout interprets a provision meant to *ensure* employees' access to rewards as in effect *penalizing* employers who offer more opportunities to qualify for rewards. As one court remarked when rejecting the same argument, "[t]his no-good-deed-goes-unpunished interpretation is contrary to logic." *Noel v. Pepsico, Inc.*, No. 24-cv-7516, 2026 WL 558118, at *12 (S.D.N.Y. Feb. 27, 2026); *see also Chirinian v. Travelers Cos.*, No. 24-cv-3956, 2025 WL 2147271, at *8

---

[1] This final rule was jointly issued by the Departments of Labor, Treasury, and Health and Human Services.

(D. Minn. July 29, 2025); *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 24-cv-2749, 2025 WL 2779899, at *10 (W.D. Tenn. Sept. 26, 2025).

Instead, the Court adopts a more plausible reading: § 300gg-4 requires employers to allow employees to qualify for the full reward at least once per year.  As long as employers meet that requirement, they are free to offer additional opportunities to qualify for a partial reward.  This interpretation of the statute does not conflict with the regulatory preamble cited by Trout; that preamble merely describes what "full reward" means, and says nothing about how many times per year a full reward must be offered.[2]

Trout argues that this interpretation contradicts the plan language of § 300gg-4 because "similarly situated" individuals are treated differently depending on what time of year they complete the program.  42 U.S.C. § 300gg-4(j)(3)(D).  But statutory context refutes this interpretation of the phrase "similarly situated."  The subsequent provisions clarify that "[t]he reward is not available to all similarly situated individuals . . . unless the wellness program allows . . . for a reasonable alternative standard . . . for obtaining the reward for any individual for whom . . . it is unreasonably difficult due to a medical condition to satisfy the otherwise applicable standard."  *Id.* § 300gg-4(j)(3)(D)(i)(I).  This indicates that the prohibition on unequal treatment of similarly situated individuals is designed (like the statute as a whole) to prevent discrimination

---

[2] This interpretation also appears to align with the DOL's own view as expressed in a "Frequently Asked Question" page of its website:

> If a participant is provided a reasonable opportunity to enroll in the tobacco cessation program at the beginning of the plan year and qualify for the reward (i.e., avoiding the tobacco premium surcharge) under the program, the plan is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year. Nothing, however, prevents a plan or issuer from allowing rewards (*including pro-rated rewards*) for mid-year enrollment in a wellness program for that plan year.

U.S. Department of Labor, Employee Benefits Security Administration, FAQs about Affordable Care Act Implementation,        https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-18 [https://perma.cc/T4U5-CU33] (emphasis added).  Because Meijer's plan complies with this view and the view expressed in the preamble, it is unnecessary to determine what interpretive weight the DOL's opinion should be given.

based on participants' health conditions.  It is not designed to prevent discrimination based on the time of year a participant qualifies for the program.

In support of his position, Trout also cites *Wilson v. Whole Food Market, Inc.*, where a district court held that the "full reward" language requires an employer to provide the entire year of refunded surcharges to people who complete the alternative standard.  No. 1:25-cv-85, 2026 WL 196517, at \*26 (W.D. Tex. Jan. 19, 2026).  But *Wilson* addressed a different question than the one at issue here.  There, the employer did not offer *any* retrospective refund for surcharges, no matter when participants completed the alternative program.  *See id.* at \*2.  Thus, the court held that the employer violated the requirement that it offer the full reward at least once a year.  Here, Meijer does offer the full reward to anyone who completes the program within the first half of the year.  The question is whether Meijer is prohibited from *also* offering a partial reward to those who complete the program in the second half of the year.  And the Court finds that it is not.[3]

In sum, Meijer's wellness program complies with the "full reward" requirement because it provides full retroactive surcharge refunds to employees who complete the program in the first half of the year.  Meijer does not violate the requirement by additionally providing a partial benefit to those who complete the program later in the year.

### 2. Notice Requirements

#### (a) Violation of Section 300gg-4

Next, Trout argues that Meijer's benefits guides violate § 300gg-4's notice requirements. The pertinent subsection of the statute provides that "[t]he plan or issuer involved shall disclose in all plan materials describing the terms of the wellness program the availability of a reasonable

---

[3] Trout also cites *Baker v. 7-Eleven Inc.*, where a court held that "limit[ing] the retroactive relief available to some participants" violated § 300gg-4.  No. 3:25-cv-1609, 2026 WL 473252, at \*5 (N.D. Tex. Feb. 19, 2026).  But *Baker* contains almost no supporting analysis, and the Court disagrees with its holding for the reasons stated above.

alternative standard."  42 U.S.C. § 300gg-4(j)(3)(E).  However, "[i]f plan materials disclose that such a program is available, without describing its terms, the disclosure under this subparagraph shall not be required."  *Id.*  The applicable DOL regulation similarly provides that "[t]he plan or issuer must disclose in all plan materials describing the terms of an outcome-based wellness program . . . the availability of a reasonable alternative standard to qualify for the reward."  29 C.F.R. § 2590.702(f)(4)(v) (2026).  The regulation also specifies that such a disclosure must "includ[e] contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated."  *Id.*  Like the statute, the regulation clarifies that "[i]f plan materials merely mention that such a program is available, without describing its terms, this disclosure is not required."  *Id.*

In response, Meijer first argues that these notice requirements do not apply because the benefits guides *mention* the Wellness Program without *describing* it.  But the Court is unpersuaded. A document that merely mentions the Wellness Program would be one that briefly refers to the fact that a tobacco surcharge may be imposed.  The benefits guides, by contrast, contain the following information:

> **Tobacco Surcharge:** $1,040 - $2,080 per year for tobacco users
>
> If you (and your spouse/domestic partner) enroll in a Meijer medical plan and use tobacco, the $20 per week surcharge will apply per tobacco user. If you are not a tobacco user, recertification is required every year on the Meijer Rewards site. Meijer also offers a tobacco cessation program – at no cost to enrolled team members (and their spouse/domestic partner). If you complete the program requirements by the deadlines, your tobacco surcharge may be refunded.

(Compl. ¶ 34.)  The benefits guides (1) specify the price of the surcharge, (2) explain the certification process, and (3) note the alternative standard (the tobacco cessation program) and the

9

possibility of a refund.  This information is extensive enough to qualify as "description," and thus to trigger 42 U.S.C. § 300gg-4(j)(3)(E)'s notice requirement.[4]

Meijer cites *Williams v. Bally's Management Group,* which held that similar language in a health care benefits guide did not qualify as a "description" of the wellness program.  813 F. Supp. 3d 263, 282 (D.R.I. 2025).  But the court in *Williams* appears to have misinterpreted § 300gg-4(j)(3)(E)'s reference to the "program."  The court stated that "[t]he Benefits Guides reference the availability of the wellness program . . . but do not concretely describe the terms of the program beyond noting that completion of the program will result in elimination of the tobacco surcharge." *Id.* at 281–82.  By "wellness program," the court apparently meant the tobacco cessation program, completion of which results in elimination of the surcharge.  But the surcharge itself is considered a "wellness program" under § 300gg-4; the tobacco cessation program is the "reasonable alternative standard" to that wellness program.  Thus, although the court in *Williams* found that the benefits guide did not describe the tobacco cessation program, it did not address the proper question: whether the benefits guide described the tobacco surcharge.  Here, even if Meijer's benefits guides do not describe the cessation program, they do describe the *surcharge*, and thus § 300gg-4(j)(3)(E)'s disclosure requirements apply.

Meijer also argues that the benefits guides do not qualify as "plan materials" subject to the disclosure requirement because "they include information about other benefits, like long- and short-term disability insurance, 401k benefits, life insurance, and identity theft protection." (Def.'s Br. 13 n.7, ECF No. 12.)  But Meijer provides no authority for the notion that a document

---

[4] The associated regulatory preamble states that "a plan disclosure that references a premium differential based on tobacco use . . . is a disclosure describing the terms of a health-contingent wellness program."  78 Fed. Reg. at 33166. Because the Court finds that the statutory language itself entails that Meijer's benefits guides describe the wellness program, there is no need to determine how much interpretive weight the Court should give to the preamble.

describing a health care plan is not a plan material merely because it also contains other information.  The Court thus finds this interpretation of "plan materials" unpersuasive.

Next, Meijer contends that even if § 300gg-4(j)(3)(E) applies, the benefits guides are compliant because they disclose the availability of a reasonable alternative standard—namely, the tobacco cessation program.  Trout responds that the meaning of the statutory phrase "disclose the availability of a reasonable alternative standard" is dictated by the above-cited DOL regulation, which specifies that such a disclosure must "includ[e] contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated."  29 C.F.R. § 2590.702(f)(4)(v).  Although the description of the tobacco surcharge in the benefits guides contains no contact information, later pages of the guides provide a phone number for the Meijer Rewards Service Center.  (*See, e.g.*, 2025 Benefits Guide, ECF No. 12-8, PageID.139.)    This is sufficient to meet the contact information requirement, so the only unmet requirement is the reference to accommodating physician recommendations.

Meijer, however, argues that this requirement is unenforceable because Congress did not grant the DOL authority to interpret § 300gg-4(j)(3)(E) or impose additional requirements beyond those included in the statute.  Resolving this dispute requires a brief detour through some fundamental principles of administrative law.

For the past several decades, questions about an agency's power to interpret a statute were resolved under the *Chevron* doctrine, which directed courts to defer to reasonable agency interpretations of ambiguous statutes.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The Supreme Court recently overruled *Chevron* in *Loper Bright Enterprises v. Raimondo*, holding that courts must resolve interpretive questions using their independent

judgment, although an agency's opinion may provide persuasive guidance. 603 U.S. 369, 392–95 (2024) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

In *Loper Bright*, the Court rejected the premise endorsed by *Chevron* that statutory ambiguities implicitly delegate interpretive discretion to agencies. However, the Court acknowledged that Congress may still *explicitly* delegate discretion to agencies. As the Court explained:

> In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes "expressly delegate[]" to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to "fill up the details" of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that "leaves agencies with flexibility," such as "appropriate" or "reasonable."

> When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, "fix[ing] the boundaries of [the] delegated authority," and ensuring the agency has engaged in "'reasoned decisionmaking'" within those boundaries. By doing so, a court upholds the traditional conception of the judicial function that the APA adopts.

*Loper Bright*, 603 U.S. at 394–96 (alterations in original) (cleaned up). When faced with a purported delegation of authority to an agency, "[a] court plays its part by (1) 'recognizing constitutional delegations,' (2) 'fixing the boundaries of the delegated authority,' and (3) 'ensuring the agency has engaged in reasoned decisionmaking within those boundaries.'" *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 371).

The most relevant source of statutory authority here is 29 U.S.C. § 1135, which provides that

> the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations

may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records . . . .

*Id.* [5]; *see also* 42 U.S.C. 300gg-4(n) ("Nothing in this section shall be construed as prohibiting the Secretar[y] of Labor . . . from promulgating regulations in connection with this section.")  Trout argues that this provision confers discretion on the DOL to specify what information a document must contain to meet § 300gg-4's disclosure requirement.  Section 1135 is the kind of provision that *Loper Bright* calls a "fill up the details" delegation, because it provides general authority to regulate and contains discretionary language like "as [the DOL] finds necessary or appropriate." In addition, the examples provided by Congress—defining technical terms, prescribing forms, and mandating recordkeeping—are all instances of filling up details that are left open by the statute. *See Chirinian*, 2025 WL 2147271, at *10 (section 1135 authorizes DOL "to fill up the details of ERISA").  It follows that § 2590.702(f)(4)(v) is a valid exercise of agency authority if it is an example of filling up details and is the product of reasoned decisionmaking.[6]

As an initial matter, some have argued that a general delegation like § 1135—which provides broad power to regulate regarding an entire subchapter, rather than (for example) specific power to interpret a given statutory provision—does not allow an agency to issue rules with the force of law.  *See DOL v. Americare Healthcare Servs., Inc.*, No. 25-3128, 2026 WL 891253, at *14 (6th Cir. Apr. 1, 2026) (Bush, J., concurring) (citing Kristin E. Hickman & Amy J. Wildermuth, *Harmonizing Delegation and Deference after* Loper Bright, 100 N.Y.U. L. Rev.

---

[5] Similarly, 29 U.S.C. § 1191c provides that "[t]he Secretary . . . may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this part."  Section 1135's reference to "this subchapter" and § 1191c's references to "this part" both encompass 29 U.S.C. § 1185d, which provides that "the provisions of part A of title XXVII of the Public Health Service Act . . . shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart."  29 U.S.C. § 1185d(a)(1).  The referenced portion of the Public Health Service Act contains 42 U.S.C § 300gg-4. *See id.* § 1185d editorial note.

[6] The parties do not argue, and the Court does not believe, that § 1135 contains an unconstitutional delegation.

13

1924, 1930–31 (2025)).  Under this view, only specific delegations (and delegations that are a hybrid of specificity and generality) authorize agencies to issue legislative rules.  It is true that the examples *Loper Bright* provides of delegations to "fill up the details" are all specific delegations. But nowhere in *Loper Bright* is the general-specific distinction made explicit, nor is it found in the Sixth Circuit cases that have applied *Loper Bright*.  *See, e.g.*, *Pickens*, 133 F.4th at 587–88; *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024).  To the contrary, the Sixth Circuit has continued to cite the *Chevron*-era principle that "a court's review 'does not turn on whether Congress's delegation of authority was general or specific.'"  *United States v. Bricker*, 135 F.4th 427, 441 (6th Cir. 2025) (quoting *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 57 (2011)).  Thus, the Court views this principle as good law even post-*Loper Bright* until the Supreme Court or Sixth Circuit says otherwise.

Given that a general delegation may provide an agency with the authority to issue legislative rules construing statutory terms, the Court finds that a regulation clarifying § 300gg-4's notice requirement is authorized by the general delegation in § 1135.  Section 300gg-4 mandates disclosure of "the availability of a reasonable alternative standard," but it does not specify how extensive such a disclosure must be, or exactly what information must be disclosed. These are details that the DOL is authorized to fill in.  And imposing the accommodation disclosure requirement contained in 29 C.F.R. § 2590.702 is a reasonable exercise of that authority.  Section 300gg-4 requires that the reasonable alternative standard accommodate individual medical needs: the alternative must be provided to "any individual for whom . . . it is unreasonably difficult due to a medical condition" or "medically inadvisable to attempt to satisfy the otherwise applicable standard."  42 U.S.C. § 300gg-4(j)(3)(D)(i)(I), (II).  Thus, it makes sense to interpret disclosure of "the availability of a reasonable alternative standard" as including disclosure of the fact that the

14

reasonable alternative will accommodate individual medical needs—not just disclosure of some specific alternative (e.g., a tobacco cessation program) that may or may not accommodate individual needs.

Meijer argues that the regulation's disclosure requirement cannot be a mere extension of the statutory notice requirement because there is a key distinction between the two. The regulation requires employers to disclose that the recommendations of an employee's physician will be accommodated; the statute, on the other hand, does not require employers to accommodate *every* recommendation of employees' physicians, but only those recommendations related to health conditions that make it unreasonably difficult or medically inadvisable to complete the wellness program. Such a fine distinction, however, does not render the regulatory disclosure requirement inconsistent with the statute. The regulation ensures that employees receive essential information about their employers' health care plans. It is reasonable in that context for the mandated disclosure to be slightly more general than the underlying substantive requirement. While it might be more accurate for the employer to disclose to its employees that "the recommendations of your personal physician will be accommodated insofar as they indicate it would be unreasonably difficult or medically inadvisable to complete the wellness program," the more straightforward language required by the regulation achieves the same goal: informing employees that the wellness program will accommodate their individual medical needs. Because this accords with the statute's requirements, the regulation's disclosure requirement is valid.

Meijer points out that even when an agency has been delegated authority, "an agency regulation that conflicts with a statute is unenforceable." (Def.'s Br. 10 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86–96 (2002)).) And Meijer argues that § 2590.702(f)(4)(v) conflicts with § 300gg-4 because the statute specifies that meeting its

requirements will render a wellness program lawful, *see* 42 U.S.C. § 300gg-4(j)(3), while § 2590.702 imposes an additional notice requirement on wellness programs. But this argument fails because, as noted above, § 2590.702 is a clarification of § 300gg-4's notice requirements rather than an additional requirement. *Ragsdale*, a Supreme Court case cited by Meijer, is not to the contrary. *See* 535 U.S. at 81. There, a DOL regulation required that employers notify individual employees about their rights under the Family and Medical Leave Act, while the relevant statute only required employers to post generalized notices in the office. *Id.* at 87–88. The regulation also provided that if an employer violated the notice requirement, the employee would essentially gain extra leave time. *Id.* at 88. The Supreme Court did not address whether the notice requirement itself was valid; it only held that "the categorical penalty the Secretary imposes for its breach is contrary to the Act's remedial design." *Id.* That holding has little application here, where the "categorical penalty" of the regulation—that is, making a wellness program invalid if it does not comply with the notice requirements—accords with, rather than contradicts, the PHSA's remedial design. *See* 42 U.S.C. § 400gg-4(j)(3) ("[T]he wellness program shall not violate this section *if the following requirements are complied with* . . . ." (emphasis added)).

Putting this all together: Section 2590.702(f)(4)(v)'s requirement that documents describing a wellness program also disclose that physician recommendations will be accommodated is valid. Meijer's benefits guides violated that requirement, so Trout has stated a claim against Meijer.[7]

---

[7] Trout also argues that Meijer violated the requirement that it disclose the availability of a *reasonable* alternative standard because Meijer's program violates the full reward requirement and is thus not reasonable. Because the Court finds that Meijer's program does not violate the full reward requirement, this claim fails.

### (b) Causation of Loss

Meijer also contends that even if its plan materials violated § 2590.702(f)(4)(v), Trout cannot seek relief because he has not alleged that this violation caused him a monetary loss.  As Meijer points out, Trout does not claim that he relied in any way on the plan documents, or that he would have (for example) participated in the tobacco cessation program had all the proper disclosures been included.  Thus, Meijer contends that any violations in the plan documents did not injure Trout.  Trout counters that his injury consists of paying a tobacco surcharge that Meijer was not permitted to impose.  Meijer does not contest that paying a surcharge could theoretically be an injury, but it points out that Trout would have apparently paid the surcharge regardless of whether Meijer had complied with the notice requirements.

Even assuming that financial loss is a necessary element of a section 502(a)(3) claim,[8] the Court agrees that the tobacco surcharge qualifies as such a loss.  The structure of § 300gg-4 indicates that any surcharge imposed is invalid unless all the statutory requirements are met; the statute provides that "the wellness program shall not violate this section *if the following requirements are complied with*."  42 U.S.C. § 300gg-4(j)(3) (emphasis added).  Thus, failing to meet the statutory requirements renders the fee invalid.  "Put differently, if the surcharge is illegal, it matters not whether Plaintiff can get out of paying it . . . ."  *Bailey*, 2025 WL 2779899, at *6; *cf. Noel*, 2026 WL 558118, at *6 ("[S]everal courts have recently held that plaintiffs have standing where they claim that they paid a tobacco surcharge imposed pursuant to a noncompliant wellness program, regardless of whether they were directly impacted by the alleged shortcomings of the program."); *Schultz v. Glens Fall Hosp.*, No. 1:25-cv-581, 2026 WL 850332, at *8 (N.D.N.Y. Mar.

---

[8] Even if loss is not an element of a section 502(a)(3) claim, Trout would still need to establish an injury for standing purposes. *See Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012).

26, 2026).  *But see Plesha v. Ascension Health All.*, No. 4:24-cv-1459, 2026 WL 279321, at *7 (E.D. Mo. Feb. 3, 2026) (employee lacked standing to challenge violation of notice requirement absent allegation that failure to notify caused specific harm).

Relatedly, Meijer argues that its noncompliance with § 2590.702(f)(4)(v) is a mere technical violation that is not redressable under ERISA absent a substantive harm.  It notes that "ERISA's authorized causes of action in [section] 502(a) include an intentional limitation on remedies available for notice or disclosure requirements."  (Def.'s Br. 22.)  It is true that section 502 imposes various restrictions on an employee's ability to recover for violations of ERISA's notice requirements.  *See* 42 U.S.C. § 1132(c).  Among other things, section 502(c) provides that an administrator or employer who fails to comply with certain notice requirements is only liable "in the amount of up to $100 a day," although "the court may in its discretion order such other relief as it deems proper."  *Id.* § 1132(c)(1), (3).  Courts have generally declined to issue substantive remedies (for example, benefit awards) under the "such other relief" category because "nothing in that subsection, or [section 502] as a whole, suggests that ERISA would approve of an affirmative damage recovery based merely on a plan administrator's failure to adhere to proper notification and disclosure procedures."  *Lewandowski v. Occidental Chem. Corp.*, 986 F.2d 1006, 1008 (6th Cir. 1993).  Thus, courts have "either . . . preclude[d] any damage award" for mere procedural violations "or limit[ed] such award to the most egregious of circumstances."  *Id.* at 1009.

Meijer urges the Court to apply the same rule here.  But that rule is grounded in the specific statutory limits on recovery contained in section 502(c), and those limits do not apply to violations of § 300gg-4.  As discussed above, § 300gg-4 indicates that a failure to comply with the section's notice requirements renders a wellness program (and thus the tobacco surcharge) invalid.  The

18

natural implication is that a violation of the notice requirements has substantive implications: If Meijer is imposing an invalid fee, then Trout may seek relief based on the imposition of that fee, even if the fee's invalidity is ultimately grounded in a procedural violation.

### 3. Fiduciary Duties

Trout also argues that Meijer violated its fiduciary duties by collecting the invalid tobacco surcharge.  Section 404 of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1).  A claim for breach of fiduciary duty may be brought under either section 502(a)(2) or 502(a)(3).  The Court will consider each provision in turn.

### (a) Section 502(a)(2)

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), provides that a plan participant may bring a civil action "for appropriate relief under section 1109."  Section 1109, in turn, provides that a fiduciary who breaches their duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." 29 U.S.C. § 1109(a).  Trout contends that Meijer violated its fiduciary duties by using the funds collected via the tobacco surcharge to offset its own contributions rather than increase funding to the plan.

Significant divergence exists among the district courts that have considered similar arguments.  *Compare, e.g.*, *Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882, 902 (E.D. Va. 2025) (plaintiff stated claim for breach of fiduciary duty where "Defendant collected and held Plan assets, in the form of unlawful tobacco surcharges, in its own accounts and failed to contribute as much of its own assets to the Plan" (cleaned up)); *Bailey*, 2025 WL 2779899, at *20 (similar),

19

*with Noel*, 2026 WL 558118, at \*14 (plaintiff failed to state claim for breach of fiduciary duty because "[e]ven accepting that Defendants used the surcharge funds to offset their own contributions, it is unclear how this conduct could have caused injury to the Plan, as opposed to the individuals from whom the surcharge was collected"); *Chirinian*, 2025 WL 2147271, at \*12 (similar); *see also Hill v. XPO, Inc.*, No. 24-cv-1697, 2026 WL 884149, at \*12 (D. Conn. Mar. 31, 2026) (collecting cases).

The parties initially disagree about whether Trout must allege that the plan was harmed by Meijer's activities, or merely that Meijer unjustly profited from plan assets.  Meijer argues for the former, and cites to cases where the Sixth Circuit has stated that "[t]o be actionable under [section 502](a)(2), an alleged breach of fiduciary duty must result in a loss to the plan." *Wolf v. Causley Trucking, Inc.*, 719 F. App'x 466, 476 (6th Cir. 2017); *see also Walker v. Fed. Express Corp.*, 492 F. App'x 559, 562 (6th Cir. 2012) ("[Section 502](a)(2) bars Plaintiff's recovery for individual relief in the form of payment for the individual insurance policy and requires Plaintiff to allege injury with respect to the actual plan."); *Patterson v. United HealthCare Ins. Co.*, 76 F.4th 487, 498 (6th Cir. 2023) ("[Section] 1109 only contemplates suit to remedy harm to the plan itself.").

Trout objects that such a principle contradicts 29 U.S.C. § 1109(a), which allows relief "to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan," regardless of whether there has been a loss to the plan.  Trout points to several out-of-circuit cases holding that "ERISA's duty of loyalty bars a fiduciary from profiting even if no loss to the plan occurs." *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 415–16 (3d Cir. 2013); *see also Pender v. Bank of Am. Corp.*, 788 F.3d 354, 366–67 (4th Cir. 2015) ("We . . . agree with the Third Circuit that a financial loss is not a prerequisite for Article III standing to bring a disgorgement claim under ERISA." (cleaned up)).

20

In the Court's view, the apparent disagreement between the cited cases is illusory.  To bring a section 502(a)(2) claim, a plaintiff must allege that the plan was harmed by the fiduciary's breach. But that harm need not take the form of a loss on the plan's balance sheet.  Rather, an opportunity cost—the missed chance to make a profit—may constitute harm as well.  When a defendant wrongfully profits from the plan's assets, the plan is harmed insofar as it loses out on profits that should have rightfully gone to the plan instead of the fiduciary.  The case law Meijer cites is not to the contrary.  In *Wolf*, there was no harm to the plan because "[t]he Plan at issue . . . had no funds held in trust."  719 F. App'x at 476.  Thus the question of when an unjust profit constitutes harm did not come up.  *Walker* held that a plaintiff could not recover "individual relief" without any "plan wide injury," but did not address the question of what *kind* of harm to the plan qualifies as injury.  492 F. App'x at 559.  Thus, neither case supports Meijer's view that a wrongful profit does not constitute harm to the plan.  In sum, to state a claim under section 502(a)(2), Trout must allege that Meijer's collection of surcharges either caused a monetary loss to the plan or caused Meijer to obtain profits that should have instead gone to the plan.

However, Trout has alleged neither.  Trout argues that Meijer's use of the surcharges to offset its own contributions left the plan with less money than it would have had if Meijer instead added the surcharges on top of its contributions.  This much is true, but it does not entail that Meijer breached its fiduciary duties. Meijer could always voluntarily add funds to the plan from its own assets, but the failure to do so does not constitute harm to the plan unless Meijer had an affirmative duty to contribute those assets.  Whether Meijer had such a duty depends on the specific design of the plan.  Because Trout has not pointed to any feature of the plan that created such a duty—indeed, the plan's constituting documents are not in the record at all—he has not stated a claim.

Moreover, even if Trout could show that Meijer possessed a duty to contribute assets, he has not established standing to sue for a breach of that duty.[9] *See Murray*, 681 F.3d at 748 (standing requires plaintiff to "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief").  Depending on the nature of the plan, a violation of fiduciary duty may not impact the employees.  For example, in a defined benefit pension plan, "[t]he plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed."  *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 543 (2020).  Thus, a plaintiff cannot recover for a fiduciary's mismanagement of a defined benefit plan without alleging some concrete impact on the employees, such as that "the alleged mismanagement of the plan substantially increased the risk that the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits."  *Id.* at 546.  In other words, harm to the plan is necessary but not sufficient to state a section 502(a)(2) claim; harm to the individual participants is also necessary.

The plan at issue here is a welfare benefit plan, not a defined benefit pension plan, so the analysis may not be identical to *Thole*.  In *Knudsen v. MetLife Group,* the Third Circuit recognized that some welfare benefit plans are designed such that a reduction in the plan's assets leads to increased employee premiums.  117 F.4th 570, 579 (3d Cir. 2024).  Thus, the court left open the possibility that a plaintiff could sue a fiduciary that kept rebates for itself instead of depositing them in the plan, although it dismissed the case because there was no "allegation[] that drug rebates (or even the total value of plan assets) are, under the Plan documents, used to calculate Plan participants' out-of-pocket costs and that the effect of these inputs would decrease costs."  *Id.* at

---

[9] Although Meijer does not frame its argument in terms of standing, the Court may address standing sua sponte because the issue implicates its subject matter jurisdiction.  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 983 (6th Cir. 2012).

582. In short, depending on the structure of the plan, Meijer's failure to contribute assets might have affected employees' premiums or benefits, or it might have had no impact at all. Unfortunately, the record before the Court provides few details about the plan's structure. Given this absence of information, Trout has neither established standing nor stated a claim regarding Meijer's use of the surcharges.

Similar reasoning applies to Trout's argument that Meijer wrongfully profited from plan assets. Even assuming that the tobacco surcharges qualify as plan assets, it is not enough for Trout to allege that Meijer used the surcharges to reduce its contributions (and thus profited from their collection). Rather, Trout must establish that Meijer obtained profits that should have rightfully gone to the plan itself; otherwise, Meijer's profiting was not wrongful. Again, the question of where the surcharges should have rightfully gone depends on the structure of the plan. For example, in a defined benefit pension plan (unlike a defined contribution pension plan), the employees are not entitled to the profits made off their contributions; "the employer, not plan participants, receives any surplus left over after all of the benefits are paid." *Thole*, 590 U.S. at 543; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (beneficiaries of defined benefit plan "have no interest in the Plan's surplus"). Thus, if Meijer's health care plan is structured similarly to a defined benefit pension plan, it may not have acted wrongfully by profiting from the tobacco surcharges. Because Trout does not clarify the nature of Meijer's health care plan, he has not alleged that the employees were entitled to the profits that Meijer made from their surcharges.

Finally, insofar as Trout argues that the collection of an invalid fee was itself a violation of fiduciary duty (in addition to a statutory violation) redressable under section 502(a)(2), this

argument also fails because he has not sufficiently alleged that the collection of the fee harmed the plan itself, rather than just the plan participants.

**(b) Section 502(a)(3)**

Trout seeks both individual and plan-wide relief regarding the alleged violations of fiduciary duty. As noted above, section 502(a)(2) only allows plan-wide relief based on harms to the plan. However, the Supreme Court has held that plan participants may seek individualized relief under section 502(a)(3) for violations of fiduciary duty, although the available relief under section 502(a)(3) is limited to equitable (rather than legal) remedies. *See Varity Corp. v. Howe*, 516 U.S. 489, 507–515 (1996); 29 U.S.C. § 1132(a)(3) (plaintiff may obtain injunction or "other appropriate equitable relief"). Because relief under section 502(a)(3) may be individualized, it follows that the harms alleged may also be individualized.

However, Plaintiff still fails to state a claim that Meijer breached its fiduciary duties by using the surcharges to offset its own contributions. As discussed above, the absence of information in the record regarding the structure of the plan makes it impossible to determine whether Meijer had a duty to use the surcharges in the participants' interests or whether Meijer's use of the surcharges caused any harm to the participants. Although section 404 of ERISA appears to set out a "limitless duty of loyalty," "a fiduciary's obligation is implicitly circumscribed by the plan at issue and its promise of benefits." *Donelson v. Meijer, Inc.*, No. 1:25-cv-1156, 2025 WL 3754241, at *3 (W.D. Mich. Dec. 29, 2025). Thus, "a fiduciary's duties are only to provide beneficiaries the specific benefits promised in the plan." *Id.* at *2. Without a clearer understanding of the plan at issue here, the Court cannot determine what the promised benefits were.

Plaintiff also argues that merely *imposing* the surcharge was a breach of fiduciary duty, regardless of what Meijer did with the funds. However, the imposition of the surcharge was a decision made by Meijer in its settlor capacity, not in its fiduciary capacity. *See Greene v.*

24

*Progressive Corp.*, No. 1:24-cv-1890, 2026 WL 785004, at \*11 (N.D. Ohio Mar. 20, 2026); *Sec'y of Lab. v. Macy's, Inc.*, No. 1:17-cv-541, 2022 WL 407238, at \*4 (S.D. Ohio Feb. 10, 2022). ERISA's fiduciary obligations apply only when a defendant exercises "discretion" that is "relate[d] to fiduciary functions such as plan management or administration, or those acts designed to carry out the very purpose of the plan." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 720 (6th Cir. 2000) (cleaned up); *see also* 29 U.S.C. § 1002 (defining "fiduciary"). Thus, "ERISA's fiduciary duty requirement simply is not implicated where [a defendant], acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan." *Hughes Aircraft*, 525 U.S. at 444. Because the collection of surcharges is a feature of plan design, not an aspect of managing plan assets, it does not implicate Meijer's fiduciary duties.

There is another wrinkle here: the tobacco surcharge included in the plan is only unlawful because of the failure to include proper disclosures in the plan documents. And informing participants about a plan *is* a fiduciary function. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 405 (6th Cir. 1998). Thus, Plaintiff could argue that Meijer violated a fiduciary duty by failing to make proper disclosures. However, insofar as the lack of notification (rather than the imposition of an unlawful fee) is the relevant breach, Plaintiff cannot state a claim because he has not shown that "the breach resulted in harm to" him. *Chelf v. Prudential Ins. Co. of Am.*, 31 F.4th 459, 464 (6th Cir. 2022); *cf. James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (claim for breach of fiduciary duty related to misleading communication requires allegation of detrimental reliance). Plaintiff does not allege that the failure to include proper disclosures affected him in any way, so he cannot state a claim for breach of fiduciary duty related to the lack of disclosures.[10]

---

[10] There is no contradiction between this conclusion and the holding that Trout can establish an injury for his § 300gg-4 claim based on the imposition of an unlawful fee without showing he was impacted by the lack of proper disclosure. Trout's fiduciary duty claim is based on a fiduciary's independent responsibility to disclose information, separate from

25

### 4. Prohibited Transactions

Finally, Plaintiff argues that Meijer engaged in a transaction prohibited by section 406 of ERISA, 29 U.S.C. § 1106, by using the surcharges to offset its plan contributions.  However, the prohibited transactions listed in section 406 apply only when a fiduciary acts "with respect to a plan" and manages plan assets.  *See generally* 29 U.S.C. § 1106.  Because (as discussed above) the Court cannot discern whether the surcharges were plan assets, it cannot determine whether Meijer's use of those assets constitute prohibited transactions, and Trout has failed to state a section 406 claim.

\*    \*    \*

In sum, the Court will dismiss all of Trout's claims except his section 502(a)(3) claim for violation of 29 C.F.R. § 2590.702(f)(4)(v)'s notice requirement.

### B. Statute of Limitations

Meijer next argues that some of the claims Trout purports to bring on behalf of a class are barred by the statute of limitations.  Trout's proposed class includes employees who paid a tobacco surcharge "from 2014 to the time of judgment."  (Compl. ¶ 47.)  A statute of limitations defense may be raised on a motion to dismiss if "the allegations in the complaint affirmatively show that [a] claim is time-barred."  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012).  Trout contends that the Court should postpone consideration of this issue to the class certification stage. But the Court is not aware of any binding authority to that effect, and it is more efficient to address the issue now so as to properly limit the scope of class-related discovery.

ERISA contains a statute of limitations provision, but it is only applicable to claims for breach of fiduciary duty.  29 U.S.C. § 1113 ("No action may be commenced under this subchapter

---

§ 300gg-4's non-discrimination requirement.  Thus a breach of fiduciary duty would not make the fee unlawful, and would require some separate concrete harm.

26

with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part . . . ."); *Med. Mut. of Ohio v. K. Amalia Enters. Inc.*, 548 F.3d 383, 391 n.5 (6th Cir. 2008); *Dennis v. Sawbrook Steel Castings Co.*, 792 F. Supp. 552, 556 (S.D. Ohio 1991) ("By its own terms, § 1113 is only directly applicable to actions alleging violations of the section entitled fiduciary responsibility, and thus does not control actions alleging violations of other ERISA provisions."). As discussed above, Trout only states a claim for violation of § 300gg-4, not for breach of fiduciary duty, so § 1113 does not apply.

Meijer notes that when § 1113 does not apply, "the statute of limitations for an ERISA claim is [generally] governed by the most analogous state statute of limitations." *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 682 (6th Cir. 2013). However, "[i]n a case involving a federal cause of action that arises under an Act of Congress that was enacted after December 1, 1990, the cause of action is governed by 28 U.S.C. § 1658, which prescribes a four-year statute of limitations period." *Id.* (cleaned up). And "[t]he Supreme Court has held that § 1658 applies to claims 'arising under' amendments to pre-existing statutes." *Id.* (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 380–81 (2004)). Although section 502(a)(3) predates 1990, it was not until 1996 that Congress enacted section 702 of ERISA, 29 U.S.C. § 1182, which prohibits group health plans from discriminating based on health status. Trout's claim is based on § 300gg-4's discrimination prohibition, which was enacted in 2010; because both section 702 and § 300gg-4 postdate 1990, it is unnecessary to determine which of the two provides the relevant benchmark. Thus, because "the plaintiff's claim against the defendant was made possible by a post-1990 enactment," it is subject to § 1658's limitations period. *McCormick v. Miami Univ.*, 693 F.3d 654, 663 (6th Cir. 2012) (quoting *Jones*, 541 U.S.

at 382); *see Hill*, 2026 WL 884149, at *6 (applying § 1658 to ERISA claim for discriminatory surcharge).

Because § 1658 applies here, Trout may only bring claims on behalf of employees who paid the tobacco surcharge within four years of the date of commencement of this lawsuit (i.e., on or after November 5, 2021).

## C. Available Remedies

As discussed above, Trout has stated a claim under section 502(a)(3) for Meijer's failure to include required disclosures in its benefits guides.  Trout requests various forms of relief, including surcharge, equitable restitution, and disgorgement.  Section 502(a)(3) provides that a participant in a plan may bring suit "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 19 U.S.C. § 1132(a)(3) (emphasis added).  Meijer argues that Trout cannot seek surcharge, restitution, or disgorgement because these remedies (in this context) are not equitable; they are merely monetary compensation by another name.[11]

As the Sixth Circuit has explained,

> The word equitable is a "legal term of art," so we presume that it comes with its technical legal meaning.  It recalls the time in our history when governments divided their benches into distinct courts of equity and courts of law. These two courts could provide different types of remedies. As "the classic form of legal relief," the law courts would grant compensatory damages. And as the classic form of equitable relief, the equity courts would grant injunctions.

*Aldridge v. Regions Bank*, 144 F.4th 828, 844–45 (6th Cir. 2025) (cleaned up).  But ERISA's reference to equitable remedies does not include every remedy that an equity court could grant;

---

[11] Meijer does not challenge Trout's ability to seek an injunction, which is explicitly authorized by section 502(a)(3).

for certain causes of action, such as trust-related cases, equity courts "could grant any conceivable remedy." *Id.* at 846.  Rather, section 502(a)(3) only authorizes "those remedies 'that were *typically available in equity,*'" which are generally those remedies that equity courts could grant in cases where they had concurrent jurisdiction with courts of law.  *Id.* at 845–46 (quoting *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 256 (1993)).  Thus, Trout's ability to seek a given remedy turns on whether that remedy was available to equity courts in areas of concurrent jurisdiction.

Begin with surcharge.  Surcharge is "monetary compensation for a loss resulting from a trustee's breach of duty."  *Aldridge*, 144 F.4th at 847 (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 441–442 (2011)).  Although the Supreme Court has suggested in dicta that surcharge is an equitable remedy, *see Amara*, 563 U.S. at 442, the Sixth Circuit has since held that surcharge "was not *typically* available in equity because equity courts could not grant it in concurrent-jurisdiction cases."  *Aldridge*, 144 F.4th at 847.  Trout argues that *Aldridge* is distinguishable because the plaintiffs there tried to recover unpaid benefits that the defendants owed them, rather than a fee they had paid to the defendants.  But such a distinction is not borne out by the *Aldridge* opinion, which frames its holding in categorical, rather than context-dependent, terms.  *See, e.g.*, *id.* at 847 ("[E]quity courts could order an equitable surcharge only in trust cases when they had exclusive jurisdiction.").  Thus, *Aldridge* precludes Trout from obtaining surcharge under section 502(a)(3).

Next, restitution.  The term "restitution" can refer to both legal and equitable remedies, depending on "the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (cleaned up).  Thus, the Supreme Court has observed (somewhat tautologically) that "restitution is a legal remedy when ordered in a case at law and an equitable remedy . . . when ordered in an equity case." *Id.* (alteration in original).  The key distinction is that equitable restitution requires recovery of a specific fund or

29

piece of property, whereas legal restitution can involve recovery from a defendant's general assets. In other words, restitution is legal if the plaintiff seeks "a judgment imposing a merely personal liability upon the defendant to pay a sum of money." *Id.* It is equitable if "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* Trout can therefore seek restitution under section 502(a)(3) if he traces the fees Meijer collected to particular funds or property. *See id.* at 218. The Court will return to the issue of traceability momentarily.

Finally, disgorgement. Disgorgement is a "remedy that 'deprive[s] wrongdoers of their net profits from unlawful activity.'" *Patterson*, 76 F.4th at 497 (quoting *Liu v. SEC*, 591 U.S. 71, 79 (2020)). The Sixth Circuit has held that disgorgement qualifies as an equitable remedy under section 502(a)(3). *Id.* at 497–98. The more complicated question is whether disgorgement (like equitable restitution) has a tracing requirement. In *Patterson*, the Sixth Circuit noted that the tracing requirement generally applies to "[r]elief in the universe of transferred assets," and noted that "[a]lthough we have not so held, there is reason to believe the tracing requirement also applies to disgorgement in ERISA cases between two private parties." *Id.* at 497. Later in the same case, the court seemed to provide an even stronger statement: "If in the end [the defendant] spent the $25,000 on nontraceable items," then the plaintiff "can no longer invoke disgorgement." *Id.* at 498.

However, the above-quoted statements in *Patterson* were dicta, and other Sixth Circuit case law provides reason for pause. In *Osborne v. Griffin*, the Sixth Circuit confronted the question of whether disgorgement was an equitable or legal remedy in the context of the Seventh Amendment, which requires jury trials only when legal remedies are at stake. 865 F.3d 417 (6th Cir. 2017). The district court had required the defendants to disgorge profits obtained from

wrongfully acquired stocks and real estate.  The Sixth Circuit held that no jury trial was required because "actions seeking disgorgement of ill-gotten gains are equitable in nature." *Id.* at 461.  The defendants countered that the disgorgement at issue could not be equitable because the plaintiffs had recovered from the defendants' general funds (akin to a monetary judgment), whereas equitable remedies usually "restore to the plaintiff particular funds or property in the defendant's possession," which would require tracing.  *Id.*

The Sixth Circuit rejected this argument, reasoning that while equitable restitution requires tracing, *see Knudson*, 534 U.S. at 214, equitable disgorgement does not.  *Osborne*, 865 F.3d at 461–62.  The court explained that "[t]he equitable disgorgement at issue in this case is the modern analog of the 'accounting of profits' remedy," an equitable remedy that did not require tracing.  *Id.* at 462.  In other words, "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset."  *Id.*  This conclusion—that disgorgement does not require tracing—appears to conflict with the Sixth Circuit's statement in *Patterson* that disgorgement does require tracing.

Fortunately, the apparent conflict is readily resolvable.  *Osborne*'s holding is not that every remedy called disgorgement has no tracing requirement; rather, it is that "[t]he equitable disgorgement at issue *in this case*" had no tracing requirement because it "is the modern analog of the 'accounting of profits' remedy."  *Osborne*, 865 F.3d at 462 (emphasis added).  An accounting of profits is a remedy invoked when a defendant has unlawfully profited from an asset that rightfully belongs to the plaintiff.  "If, for example, a plaintiff is entitled to a constructive trust on particular property held by the defendant, he may also recover profits produced by the defendant's use of that property." *Knudson*, 534 U.S. at 214 n.2.  To obtain an accounting of profits, a plaintiff need not trace the profits themselves to whatever account they have ended up in.  *See id.* (plaintiff

31

need not "identify a particular res containing the profits sought to be recovered"). *Osborne* merely reaffirms this principle: the plaintiffs did not have to trace the profits that the defendants made off the stocks and real estate they had wrongfully acquired.

But an accounting for profits still requires tracing in a sense, because the plaintiff has to show that the profits are attributable *to the plaintiff's assets*. *See Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1226 (10th Cir. 2019) ("[P]laintiffs cannot recover under [an accounting or a disgorgement of profits] theory without first identifying the profit generating property or money wrongly held by [the defendant]." (alterations in original) (quoting *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 238 (3d Cir. 2009))); Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. b (2011).  Here, Trout can only obtain an accounting of profits if he can show that the profits arose from some asset that belonged to him; while he does not have to trace the profits to any particular account, he does have to trace the underlying asset.

In short: Disgorgement that seeks money from a defendant's general funds (rather than return of a specific asset) is a "typical equitable remedy," and thus available under section 502(a)(3), if it takes the form of an accounting of profits.  *Cf. Knudson*, 534 U.S. at 213 (holding that restitution is equitable for purposes of section 502(a)(3) only when it has specific equitable characteristics).[12]  To seek an accounting of profits, a plaintiff must trace their lost property up to the point where it generates profits for the defendants, though a plaintiff need not trace the profits themselves.

Putting everything together, Trout may seek restitution or disgorgement if he can trace the tobacco surcharges to a specific fund.  Is such tracing possible here?  Trout alleges that Meijer

---

[12] As the Fifth Circuit has observed, *Knudson* supports the principle that remedies are either equitable or legal in nature under section 502(a)(3) based on their specific characteristics, not the general umbrella category (e.g., "restitution," "disgorgement") into which they might be placed.  *See SEC v. Hallam*, 42 F.4th 316, 332 (5th Cir. 2022).

collected the surcharges from employees' paychecks, and then added those surcharges to the plan to offset its own contributions.  Once the surcharges were placed in the plan, they were commingled with other funds—but that does not necessarily prohibit tracing.  Rather, "if a defendant only commingles the plaintiff's claimed funds with its other assets, the defendant still possesses the claimed funds, making the plaintiff's remedy an equitable one."  *Sheet Metal Workers' Health & Welfare Fund of N.C. v. L. Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 354 (6th Cir. 2021); *see Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 149 (2016).  Admittedly, the Sixth Circuit suggested in *Patterson* that transferring funds to an ERISA plan constitutes dissipation and thus prevents tracing.  76 F.4th at 498 ("If in the end [the defendant] spent the $25,000 on nontraceable items or transferred it to the plan, as two examples, [the plaintiff] can no longer invoke disgorgement and equitable restitution.").  But that dicta was unsupported by any reasoning, and the Court is not aware of any binding case law holding that commingling funds within an ERISA plan necessarily bars tracing.  Although the question of tracing will ultimately be a factual one, the Court is satisfied at this stage that Trout has sufficiently alleged his entitlement to restitution and disgorgement.[13]

## IV. CONCLUSION

In sum, the Court will dismiss all of Trout's claims except for his claim under section 502(a)(3) that Meijer's benefits guides violate the notice requirement in 29 C.F.R. § 2590.702(f)(4)(v). It will also dismiss all claims that accrued before November 5, 2021.  Finally,

---

[13] Meijer also contends in a footnote that Trout cannot obtain a declaratory judgment because it is not an equitable remedy.  The Supreme Court has indicated that a declaratory judgment is legal in nature (and thus not available under section 502(a)(3)) when it is merely a vehicle to obtain money from the defendant. *See Knudson*, 534 U.S. at 210 ("Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages . . . .'" (emphasis added)).  On the other hand, a declaratory judgment that accompanies an injunction may be equitable in nature. *See Pub. Affs. Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (describing declaratory judgment as a form "of equitable relief").  Thus, insofar as Trout may obtain an injunction to bar Meijer from violating 29 C.F.R. § 2590.702(f)(4)(v), he may also obtain an associated declaration.

it finds that Trout may seek equitable disgorgement and restitution as long as he meets their respective tracing requirements, but he may not seek surcharge.

An order will enter in accordance with this Opinion.

Dated: April 23, 2026 _____    /s/ Hala Y. Jarbou _____
                                          HALA Y. JARBOU
                                          CHIEF UNITED STATES DISTRICT JUDGE